In the Matter of the Probate of the Last Will and Testament of MARGARET TURK, Deceased.

Surrogate's Court, Monroe County, February 18, 1927.

Wills — construction — devise to commissioners of Mount Hope Cemetery, Rochester, for perpetual care of cemetery lot, is trust for private purpose and invalid — said commission, under provisions of Rochester city charter, has no power to accept devise — appointment of substitute trustee — proper method of securing perpetual care of lot — devise is not purpose for which express trust may be created under Real Property Law, § 96 — said trust not authorized by Real Property Law, § 114-a, and Personal Property Law, § 13-a — estate valued at approximately $9,000 — extrinsic evidence of testatrix's circumstances may be considered where literal execution of will would result in extravagance — devise is unreasonable in amount — intent of testatrix was to make devise adequate to care for cemetery lot — testatrix must be deemed to have died intestate as to that part of estate not required to care for said lot.

A devise to the commissioners of Mount Hope Cemetery of Rochester, which is owned and managed by the city of Rochester as a public cemetery, under the direction of a commission appointed by the mayor, for the perpetual care of a lot therein, is invalid, for it is a devise to the public principal of said commission, the city of Rochester, in trust for a private purpose; moreover, said commission, under the provisions of the Rochester city charter, has no power to accept such a devise.

The incapacity of the commission to assume or execute a trust for a private purpose necessitates the appointment of a substitute trustee by the Supreme Court.

In order to obtain from the city of Rochester the perpetual care of a lot in this cemetery, the provisions in a will, instead of setting up a trust, should follow that provision of the charter on " perpetual contract fund," and merely direct the executor to " deposit " with the " city treasurer " a certain sum and take therefor the " covenant " of the city.

Furthermore, the devise here is an attempt to make the commission a trustee with power by implication only over the rents and proceeds of testatrix's estate for the perpetual care of the burial lot and cannot be regarded as a purpose for which an express trust may be created, under section 96 of the Real Property Law.

Section 114-a of the Real Property Law and section 13-a of the Personal Property Law, which legalize a trust for a private burial lot, are inapplicable to public corporations and do not remove the incapacity of a municipal corporation to act as such trustee. The provisions of said sections relate to private burial lots, not to public cemeteries; to cemetery associations, not to municipal corporations.

Where the literal execution of unambiguous provisions of a will must necessarily result in what may be fairly called extravagance or folly, resort may be had to extrinsic evidence of circumstances contemporaneous with the execution of the will in order to discover whether or not the testator actually intended to perpetuate such a strange and unusual bequest.

Accordingly, this devise of all of testatrix's property consisting of a house and lot valued at $7,000, together with $2,000 in movable property, is unreasonable in amount, and in view of the humble station in life of the testatrix, her not unfriendly attitude toward her nieces and nephews, her lack of income, the meager property which she possessed, and the fact that the city ordinarily undertakes perpetual care of such lots as testatrix's for $200, it must be held that it was the intent of testatrix to devise only a reasonable amount for the perpetual care of the cemetery lot and that she died intestate as to that part of her estate not required to care for the burial lot.

PROCEEDING for probate of will involving construction of provision relating to care of burial lot.

*Kenneth B. Keating,* for Harvey F. Remington, petitioner.

*Homer E. A. Dick,* special guardian.

*George B. Draper, Deputy Corporation Counsel,* city of Rochester, for the Commissioners of Mount Hope Cemetery.

*Simon L. Adler,* for various heirs.

FEELY, S. Upon the return day of the citation for probate herein, answers were filed, by the special guardian, and by other heirs, praying only that this court construe the propounded instrument, which relates mostly to care of the burial lot wherein are interred the bodies of testatrix, her husband, their children and some relatives.

The facts are, practically, all undisputed. Testatrix died May 1, 1926, at the age of sixty-five, or thereabout. She left no relatives nearer than a dozen nephews and nieces; all of whom, but one, are non-residents. Violet McClure, a niece, lived with her for two months in 1923. Her husband, Louis F. Turk, had died eight months before she did. Two children had been born to them; both of whom died in youth, about twenty years ago; and their bodies were buried in the west half of lot 92, range 3, in Mount Hope Cemetery, Rochester. The right of burial in this lot became

Misc. 803]    Surrogate's Court, Monroe County, February, 1927.

the property of testatrix on the death of her husband.  In it she buried his body; but failed to mark his grave.  Her own body was interred there also, without a monument, as yet.  There are also several others, relatives of Mr. Turk, buried in unmarked graves in this lot.  The lot is situate in the middle of the newer, or southern, portion of the cemetery, where the ground is less rolling.  The area of this half lot is 666 square feet, being about 16 feet by 40 feet. The actual conditions in November, 1926, are shown in the photos in evidence (Exhibits F, G and H).  This section appears to be a middle class one, with a uniform style of low, small, inexpensive monuments; although the superintendent testified it is a section where the lot owners, and particularly some of the best Jewish people, keep up the appearance of their lots.

The husband of testatrix had been employed in the cemetery for forty years, first as a laborer, and later as foreman of a grass-cutting gang.  He and his wife made their home very near the cemetery for several years before his death.  This house and lot, valued at about $7,000, together with $2,000 in movable property, make up the estate of testatrix.

Her last will, in brief, is so drawn as to devote the whole estate, after payment of her debts and funeral expenses, to the perpetual care of this burial plot.  It also contains a clause prohibiting both removal of remains and also further interments.  This will was prepared by an attorney at law, who has practiced his profession in the city of Rochester for nearly forty years.  He had previously drawn and attended to the execution of wills for this couple.  The will in question was subscribed by testatrix February 16, 1926, the attesting witnesses being the draftsman and Mrs. Fredericke Penzelin.  This lady lived in the cemetery, where also her husband was employed.  She and others testified testatrix was seldom visited by any one; and that after Mr. Turk's death, testatrix lived alone and kept aloof from her neighbors.  When she left the house, it was to get necessaries, or to visit, in season, the graves of her children.  She neither went to church nor to the theatre.  The testimony, especially that of Mrs. Anna Schauble, shows testatrix was eccentric and quarelsome.  Her oddity, while it manifested itself in unjustifiable quarrels with and abuse of all of her neighbors, even those who nevertheless remained well-disposed toward her, and in other petty and irrational ways, was not shown to amount to insanity generally, but evidence of this mental condition was received to show the circumstances in which the will in question was made.  The dispositive provisions of it are as follows:

" (1) After the payment of all my lawful debts and funeral expenses, I give all my property, both real and personal, to the

Surrogate's Court, Monroe County, February, 1927.      [Vol. 128

Commissioners of Mount Hope Cemetery of Rochester, N. Y., for the purpose of the perpetual care of the west one-half of lot No. 92, Range 3, standing in the name of Louis F. Turk, and also the lot standing, or which stood, in the name of Ella Goodwin, adjoining or a part of the west half of such lot No. 92:

" (2) I do hereby direct and request that no interment be made upon such lot or lots, other than those now on said lots, and for my body, and that no remains be removed from such lots.

" Likewise, I make, constitute and appoint John W. Keller of Rochester, N. Y., to be the executor of this my last will and testament, hereby revoking all former wills by me made.   *    *    * "

The person named executor is, and has been for over twenty-five years, the superintendent of said cemetery. Title is not put in him; neither is he, nor the commission, given express power to sell the real estate.

Mount Hope Cemetery consists of several hundred acres of land in the city of Rochester; and is owned and operated by the city of Rochester as a public cemetery, under the control and direction of an unincorporated board of three persons, appointed by the mayor, and known as " The Mount Hope commission." The city charter authorizes this commission to expend, from time to time, interest received from a deposit with the city treasurer, made by any person, of a fixed sum, usually now about $200, or a dollar a square foot, for the purpose of keeping any burial lot forever in ordinary repair. Upon receipt of such deposit, the city treasurer, city clerk and a majority of the commission are also authorized to covenant on the part of the city accordingly; and the city is not liable ever to repay the principal of any sum so paid into this " perpetual contract fund." (Rochester City Charter [Laws of 1907, chap. 755], § 546.) Examples of such covenants are seen in Exhibits A and B.

The comptroller has the investment and management of this fund, under the direction of the commission. (Rochester City Charter, § 147.)

The only trust power granted this commission is to accept a conveyance, by will or deed, of a burial lot or part of lot, so as to enable the commission to " permit the interment of only such person or persons or class of persons in such lot or part of a lot " as the owner may have designated (Rochester City Charter, § 548) in such conveyance. This is only an extension of the restrictive covenant idea to a burial plot.

The charter also provides (§ 2, as amd.) that the city of Rochester has power to receive by gift, grant, devise or bequest, and to hold and convey, such personal estate and such real estate, within or without the limits of the city, as the purposes of the corporation

may require and also all other rights and privileges conferred upon it by law. Under the General Municipal Law (§ 161), the city has power to acquire land for cemetery purposes, and to maintain the same as a cemetery, with proper ornamentation. All these statutory provisions contemplate the performance by the city of its governmental duty to dispose of dead bodies for the health of the community. These provisions serve a public or social purpose. This devise is to the commissioners of the city, as such, both because they are designated only by their office in the municipal corporation, not by their individual names, and also because it runs to them for a purpose incidentally connected with their duties as such, without being a necessary part of the governmental function working out through them; that is to say, while having in general charge the city's cemetery as its officials for this purpose, they are asked to give special care forever to the private burial lot of this testator therein. In *Bates* v. *Bates* (134 Mass. 110) it was held that the care of a private burial lot, or the repair of a private monumental structure, is a matter strictly individual and personal, in which the public has no interest, but stands on the same footing as an expensive funeral.

This devise to those public agents as such, in these circumstances, is a devise to their public principal, in trust, for a private purpose. While " a city may become the trustee of a charitable trust, where the donation is made to aid some public purpose, charitable in its nature, which it is the legal duty of the city to support and provide for * * * a bequest to a county, in trust, to keep in repair the burial ground and monument of the testator is invalid because the legatee is incapable of accepting the trust, the duty imposed being inconsistent with the purpose for which such public corporations as counties are created and organized." (5 R. C. L. 321, 322, § 42, citing note in 14 L. R. A. [N. S.] 112.)

" Trusts for public charitable purposes, being for objects of permanent interest and benefit to the public, and perhaps being perpetual in their duration, are upheld under circumstances under which private trusts would fail." (5 R. C. L. 295, § 5, citing 40 L. R. A. 717.)

In order to secure from the city the perpetual care of a grave in its cemetery, instead of creating a trust, a last will should closely follow the charter section on " perpetual contract fund," and merely direct the executor to " deposit " with the " *city treasurer* " a certain sum and take therefor the " covenant " of the city, as aforesaid.

The acts mentioned below, which legalize a trust for a private burial lot, have been held inapplicable to public corporations, and

do not remove the incapacity of a municipal corporation to act as such trustee.

Moreover, the devise in question is an attempt to make the commission a trustee, with power, by implication only, over the rents and proceeds of this real estate, for the purpose of perpetual care of this burial lot. This is not a purpose for which an express trust may be created, under section 96 of the Real Property Law. The legal title to the real estate of the testatrix, therefore, would not be vested in the commission. For other obvious reasons, this trust for perpetual care would be illegal, were it not for a late extension of the policy that restored the *cy pres* rule in this State after the *Tilden* case.*

Under section 114-a of the Real Property Law (as added by Laws of 1909, chap. 218), devises in trust, to apply income to perpetual care of private burial lots in a cemetery, are declared to be permitted, and deemed to be charitable and benevolent acts; and no longer invalid for indefiniteness or uncertainty; nor as perpetuities; nor as unlawful suspensions of the power of alienation. This section, and a like one in the Personal Property Law (Pers. Prop. Law, § 13-a, added by Laws of 1909, chap. 218, as amd. by Laws of 1911, chap. 430), ends with this proviso: " But nothing herein contained shall affect any existing authority of the courts to pass upon the reasonableness of the amount of such gift, grant or devise."

The section in the Personal Property Law (§ 13-a) in two respects goes further than does the section of the Real Property Law, viz.: Section 13-a of the Personal Property Law refers to " private burial lots, in *or outside of* cemeteries; " and adds a new provision, not found in the Real Property Law, to the effect that "Any cemetery association may act as trustee of and execute any such trust * * * within its own cemetery limits and outside of any cemetery under its control, * * * whether such power be otherwise included in its corporate powers or not." These provisions relate to private burial lots; not to public cemeteries. (See *Matter of Lyon*, 173 App. Div. 473.) They relate to cemetery associations; not to municipal corporations.

Another line of inquiry is thus presented; whether this trust, in the hands of any trustee other than a public corporation, is saved, by either of the enabling acts above mentioned, from invalidity of the several sorts specified in these sections, in so far, at least, as it is reasonable in amount. Did the courts need any

---

* See *Tilden* v. *Green* (130 N. Y. 29); *Allen* v. *Stevens* (161 id. 122); *Trustees of Sailors' Snug Harbor* v. *Carmody* (211 id. 286); *Decker* v. *Vreeland* (220 id. 326, 334).— [REP.

such saving clause? Does this will preclude the question of "reasonableness in amount?"

"Reasonableness" depends, in part, upon what is meant by "care;" and by "care" we generally mean watchful regard or oversight and attention. This word must have had a special meaning to this testatrix. She knew the modern practice in Mount Hope, as in other large cemeteries, has been to level off the old-fashioned earth mounds; and thus make the whole cemetery flat, so as to make grass-cutting easier, and also to obtain a neater uniform appearance.

Mr. Turk was foreman of one of the grass-cutting gangs and spent his life going over all the cemetery lots with lawn-mowers every summer; and raked and cleaned them up after the cutting was done. For this general care, a charge of a dollar a year for the whole burial plot is assessed by the commission against the owner of the plot, regardless of whether he had wishes to have the grass cut, or not. Another sort of care is provided by "covenants" under the "perpetual contract fund" described above. If the city gets four per cent per annum on the usual $200 deposit for perpetual care, this $8 income entitles the owner of the whole plot, beside the general care last described, to have the dirt and dust washed, occasionally — in each spring, perhaps — from the monuments; and not so frequently, when the caskets have rotted down and the graves sunken in, to have them filled up to the level and sodded; and on rarer occasions, to have the monuments straightened up, if they happened to lean out of plumb, or fall down.

Testimony was offered that still further care could be given to a single grave, in the way of planting annuals on it, or putting a fresh bouquet upon it weekly, or oftener, and watering it, etc., for the season from the middle of April till the first of November; and that a modest sum for such care would be from thirty dollars to thirty-five dollars per season. At this rate, there being fifteen graves in this Turk lot, there could be laid out on it from four hundred and twenty-five dollars to five hundred and twenty-five dollars a season, or twenty dollars a week for twenty-six weeks. This would almost amount to hiring a gardener for the lot for the season. In this way, it would not be impossible to expend the entire income of this estate, and more too.

No instance was given of any such contract in force in this cemetery. Reference was made to the $1,000 deposited for the George W. Aldridge grave; but the specific purpose there was thrice a year to have a large, costly wreath placed on his grave, any one of which would cost more than $15.

There was also instanced the legacy of $1,000 for care of the Ely lot, owned by a well-known, wealthy family, and located in a better section; and one of $5,000 to care for some other feature of this Ely lot not specifically brought out in the testimony; and also of $1,000 bequeathed by the Worms will to care for four graves. No detail was given of the circumstances of this Worms lot.

If this Turk estate, of about $9,000 gross, be all applied to care of this burial lot forever, nearly two dollars a day per season will be forever spent on a piece of ground, sixteen feet by forty feet, in a middling section of the cemetery, over the remains of a couple, from humble and inconspicuous station in life, whose graves are unmarked; and would be very much out of proportion. It is hard to imagine how so much could possibly be expended. Contestant's counsel suggested resort might be had to " bouquets of orchids." Alongside the $200, for which the city, ordinarily, undertakes perpetual special care of such lots, this $9,000 legacy, an amount nearly fifty times greater than the former, appears very extravagant and unreasonable.

The unreasonableness of this has been urged by the special guardian, and by the contestants, as ground for this court to construe this legacy as effective only in so far as it provides a reasonable amount for the purpose mentioned; and that as to the surplus, testatrix be held to have died intestate. The proponents insist that testatrix could do whatever she wished with her property; and claim that the will is so clearly worded as to leave no room whatever to construe it.

In most of the cases that discuss reasonableness of burial expenses it is laid down as the general rule that " in the absence of statutory or testamentary provisions " (*Kroll* v. *Close*, 82 Ohio St. 190; 28 L. R. A. [N. S.] 571; and see *Renihan* v. *Wright*, 125 Ind. 536; 9 L. R. A. 514; *Larson* v. *Chase*, 47 Minn. 307; 14 L. R. A. 85), the amount thereof must be in keeping with the decedent's estate and station in life. We may now lay aside, therefore, cases of intestacy, and cases wherein the last will was silent on the subject of the extent of such expenditure, or cases wherein, although the will was indefinite or obscure on the amount to be so laid out, the point of reasonableness was not raised, nor passed upon. (*Matter of Pearsall,* 125 Misc. 634; *Driscoll* v. *Hewlett*, 198 N. Y. 297; and also *Matter of Seitz*, 103 Misc. 566, where the will directed a " modest tombstone " be put up; and *Matter of Young*, 92 Misc. 633, where the will did not, in terms, require all to go for funeral and monument.)

If there be shown a definite intention in the mind of the testator clearly expressed on the face of the will, to have all his residual estate applied in care of his burial lot forever, cases that appear

Misc. 803]     Surrogate's Court, Monroe County, February, 1927.

to have been decided before, or without reference to, the enabling sections above mentioned, contain statements to the effect that " such a provision is one that a testator has the right to make, even to the extent of all of his property." (*Matter of Boardman*, 20 N. Y. Supp. 60.) Such was the decision in *Pfaler* v. *Raberg* ([1885] 3 Dem. 360). In *Emans* v. *Hickman* (12 Hun, 425, *infra*) there is a statement that the testator was competent to direct that the whole of his estate should be spent for funeral expenses and a monument, and that the court would sustain such direction where the will specially manifests such an intention. So, in *Matter of Meek* (113 Misc. 301) there was found to be, in a particular paragraph of the will, a positive direction for the expenditure of a large, but specified sum of money, for the erecting of a monument and care of the cemetery plot; and, therefore, " the reasonableness of the amount of such expenditure is not to be considered."

While the plan set out in the will in question here, drawn, as it was, with legal assistance, seems to fall within the rule above stated, we are asked to consider this act of testatrix in the light of its surroundings. Under the rule of *res gestæ*, the intention of the testatrix, in so far as it may have been declared by her outside the wording of the will, cannot, as a general rule, be legally shown by any declaration, especially an oral one, other than such as immediately accompanied and sprung spontaneously out of the act of making the will. The will in question displaced a prior will this testatrix had made in 1924, which had been to the effect that if she died before her husband did, he should have not only the life use of her estate, but also power to use for his need any part or all of the principal; and that any remainder should go to Mount Hope Cemetery for the purpose of perpetual care of this burial plot. This latter provision was worded almost identically like the one now in question. Her husband, at the same time and in her presence, also made an exactly similar will, in her favor, using the same wording. Whether this, her prior will, could be lawfully used as a means of gathering what her testamentary intent was, after her husband had died, was challenged by the contestants. These prior wills were let in on the theory that being writings duly attested as declarations of like testamentary intent by the same person, they tended to show the persistency of the intention in question, and the testator's understanding of it.

Those prior wills were drafted by the attorney who drafted the instrument she made as her last. Both prior wills and the one now in question are worded substantially alike in the clauses relating to care of this cemetery lot and to further interment and removal. In those prior, simultaneous and, practically, identical

Surrogate's Court, Monroe County, February, 1927.          [Vol. 128

wills, each spouse trusted the other, surviving, would, if their needs did not consume the whole estate, attend to burial and monument. Hence, those prior wills are, naturally, silent on those matters. Later, however, when her prior will was followed closely as a model from which to dictate the burial provisions constituting the bulk of the will now in question, then being prepared for the widow, the immediate circumstances of this surviving spouse had then changed so much that the silence in the present will on those matters seems unnatural. Moreover, in the models, this couple first of all provided that their estate should primarily go, even to the extent of all of it, to provide for the necessities of the survivor of them, after which the remainder, if any there should then be, should go to care of the graves, evidently contemplating it likely that not much would remain for the latter purpose nor anything for their relatives. What was then a matter of minor importance to them, is now, in a changed situation, made the only question and one involving the whole estate. No longer having her husband's wages, and unable to get roomers to live with her, the widow had to live on the money they had saved. At that time, the phrase " all my property " was to her mind both general and indefinite, because it looked forward to whatever might happen to be left unconsumed after her life should have come to an end. She could not have had a clear idea of what it would amount to in the end.

It does not appear that the relation between the testatrix and either her heirs or her husband's relatives had changed in anywise in the period between the wills of 1924 and her last will in 1926. Testatrix, showing a family album to the witness, Mrs. Anna Schauble, after Mr. Turk's death, manifested sorrow on looking over the photos of her own relatives and those of her husband.

The prior will of August 22, 1924, was revoked and substituted by the last will in question made February 16, 1926, two and a half months before she died. Among the circumstances of this latter testamentary act of February 16, 1926, is the fact that notwithstanding both her own age and state of health and also the great all-consuming solicitude now attributed to her for unusual care of this burial lot, she forgot, not only her own relatives, and also her deceased husband to the extent of allowing nearly six months to pass, after she buried her husband's body in this lot, early in September, 1925, without ever ordering, so far as is shown here, a monument to be erected over his grave, or giving any specific direction as to her own monument; nor as to placing stones on the other unmarked graves therein; or as to the kind of stones she would like to have set. She may have been told that the provision in her will as to her own " funeral expenses " could

include a suitable monument over her remains.  The silence and generality of her last will in this regard indicates it was not so placed before her mind.  If she were told anything on that subject, it was, probably, that her " funeral expenses " would not include the cost of putting a separate stone over her husband's grave or over the others buried in this lot; and then some provision for him, if not for them, would have appeared in this will; or, at least, some provision for a common or family monument, in keeping with the enormous outlay to be made on this lot — if she actually realized or foresaw the extravagance of it.  Long before her death, in her husband's lifetime, the graves of their two children had been marked by them with small monuments, shown in the photos in evidence. Close examination of these photos will show the names of both parents with the family name unfortunately misspelled, but conspicuous, on each of the children's headstones, describing them as children of " L. F. & M. Turks."  Had she thought of it in making this will, she would undoubtedly have directed her husband's grave to be marked, and would have made some provision for her own.  She could not have been ignorant of what care this cemetery usually gave to lots in it; and yet there is omitted from this last will of hers, solely purporting to devote all of her estate to care of this burial plot, any specification whatever as to a monument for herself, or as to one for her husband, or any detail of the care to be taken of the lot in respect to flowers, shrubs, bouquets, watering, etc.  It seems incredible that she meant to leave this plot lie forever untouched, in the condition we see in the photos of it, and yet have this great sum laying out on the care of it, without anything to show either that testatrix was buried there, or that she was the author of the care being taken of it.  In these regards, the plan outlined in the wording of this will seems, in the light of its contemporaneous circumstances, to be vague and incomplete, as well as extravagant and unreasonable.  The explanation of this failure to foresee and provide for detail that is ordinarily to be expected in the simple idea or plan of spending all she had, a very considerable sum, on care of this burial plot, is probably to be found, not in any positive idea of hers that her body and that of her husband should lie hidden beneath a forever carefully cultivated greensward, with ceaseless change of flowers, and without a thing to show to the future passerby who had caused it to be done, or whose memory was thus being signally perpetuated, but some explanation may be found in her mental state at the time she is claimed to have formulated such a plan.  While her age and state of health, her oddity and eccentricity, are not urged as having proved her insane, on this record, they were shown sufficiently

to indicate that she did not then have mental power enough to sense these omissions, either in her own idea, or in the plan outlined in the wording of the will. She meant that these graves should, in any event, be cared for; but there is room to doubt she meant her whole $9,000 estate should go for care of them and for nothing but care. If she felt her estate could not afford to put up monuments, either under her own order in her lifetime, or under a direction in her will, she must have had a very vague idea of what her estate was, or would turn out, in the end, to be; or else she attached a very extraordinary meaning to the word " care," that word being the solitary specification, if it may be called such, of this great outlay. It will be recalled she was then living on her principal, for lack of income, and was consuming her estate. She, probably, thought there would not be much left when all her bills had been paid; and what small residue there might be at her death she wished to go for care of the graves; but she did not realize that only two and a half months were all that was then left of her allotted span. Death unexpectedly thwarted her plans in both regards, both before she had time either to mark the graves, or to live up any considerable portion of her means.

The resultant vagueness, incompleteness and apparent extravagance seem to place Mrs. Turk's will in the class of wills — some no worse worded than hers — wherein doubt arose out of the circumstances of the act of testamentation and of distribution. For example, as legacies either fail for lack of personalty, or are by implication from extrinsic circumstances alone, held to have various characteristics, to be charges on real estate, to be preferred, to be payable *per capita,* and so forth (See *Ely* v. *Ely,* 163 App. Div. 320; *McGoldrick* v. *Bodkin,* 140 id. 196, 199; *Matter of Lloyd,* 166 id. 1); so it has been held that an increase in the value of testator's property between a time, at the date of the will, when a remainder of about $250 was, by the will then made, wholly devoted to funeral commemorations, and the time of testator's death, two years and five months later, when the increase had brought this remainder up to the disproportionate amount of $900, was good reason both to doubt the testator intended this expenditure to run over the former amount, and also ground to declare intestacy as to the balance of $650. (*Matter of Backes,* 9 Misc. 504.) Mrs. Backes forecasted a remainder of about $250; but lived long enough after making her will for the estate to be enlarged to $900. Mrs. Turk, facing the prospect of living up her principal, looked forward to a comparatively small residual estate, which, by the acceleration of sudden death, became enlarged far beyond her original outline, so far, in fact, that she never foresaw either the unnatural omission, or the

folly and extravagance, into which her testamentary plan was precipitated by her death.

From reading the cases, I gather the rule to be that where the literal execution of unambiguous provisions of a will must result in what can be fairly called extravagance or folly, resort may be had to extrinsic evidence of circumstances contemporaneous with the execution of the will for the purpose of discovering whether or not the testator actually intended to perpetrate such strange and unusual thing. It is in this class I would put the will in question. Other classes of cases have been cited. They serve as interesting sidelights.

Another class of cases has been cited in the briefs. These cases show another source of doubt. In most of these earlier and much discussed cases on restriction of bequests apparently of the whole residuary estate for purposes of burial, the wills were the handiwork of lay draftsmen, with the characteristic individuality and oddity of such creations. Thus in *Emans* v. *Hickman* (12 Hun, 425), a sort of " leading case " is this connection, the will seems to have been a home-made document. Aside from naming an executor, the only disposition was as follows: " To my executors all money in my possession, all money due from any source or sources whatever, and all property of every kind or description held by me for my funeral expenses and the erection of a monument to my memory in the Purdy yard, in Phillipstown, Putnam County."

Admitting testator could have said all should go for a monument, the court there said: " the question is whether the will manifests that intention. The language of the will is no more indicative of an intent that his executor should expend any particular sum for those purposes, than similar language in other wills." The court adopted the view that this will did not direct that the whole be spent for funeral and monument, although the estate, about $1,200, is given to the executor, at the outset. No limit is placed to his discretion. Testator was a plain man, who wanted a decent burial in a favorite churchyard; and the construction adopted did " not convict the testator of the absolute folly of a ridiculous expenditure for his funeral and monument." (Id.)

A much more obscure, lay-drawn will is found in the *Boardman Case* (*supra*), in which a farmer, living far out in the country, gave certain heirs $500 and all the balance, after paying debts, etc., was to go to erect a monument and fence at the grave. The last clause conflicted, literally, with the first. The court reconstructed the entire will, rearranging the clauses throughout; and limited the expense for the monument.

*Matter of Welch* (105 Misc. 27) was even more informal. It ran

Surrogate's Court, Monroe County, February, 1927.　　　[Vol. 128

thus: To charity $100, to be distributed by Rev. P. J. O'Loughlin. For masses $100. Balance for burial and expenses and masses.

There was no residuary gift. The court limited the amount, citing the *Seitz Case* (*supra*).

Aside from such cases, and outside the law of trusts, perpetuities and charitable uses, no New York case has been found that, expressly on the ground of public policy, limits to a reasonable amount a definite direction, clearly expressed, to expend the whole of an estate on care of graves; but cases have been cited upholding such direction, even though it seem wasteful or in bad taste, the testator being the sole judge thereof. The limiting cases above cited seem, however, to indicate a leaning on the part of the courts to seize upon indefiniteness, or slight evidence of doubt, whether direct or circumstantial, and read against extravagance in order to avoid such unreasonable burial expenditure as those wills seem to plan or to make possible. This may be part of what is meant, in the enabling acts, by the words " any existing authority of courts to pass upon the reasonableness of the amount " of any such devise or legacy. To that extent, there was " existing authority " for the courts to interfere, even where the means adopted was not a trust.

Those acts legalize the trust as a means for providing perpetual care for private burial lots, through individuals or cemetery associations, acting as trustees. They remove the specific objections recited in the sections; and they authorize a *cy pres*, execution, or approximation, " as near as possible," of this trust purpose. (*Matter of Brundage*, 101 Misc. 528, 538.)

There is an *obiter dictum* in *Matter of Meek* (113 Misc. 301) that the enabling act (Pers. Prop. Law, § 13-a) "prescribes no limit to the amount which may be given to the objects therein specified." This remark seems *obiter*, because the decision there is that a direct legacy (not a trust) to a cemetery association for care of a burial lot, is preferred as funeral expenses; and is not subject to abatement upon shortage of assets. The question of reasonableness was not raised. These enabling sections expressly save any right the courts had to pass upon " the reasonableness of the amount; " and that implies a possible limitation on the amount. In adopting these acts legalizing trusts for perpetual care of private graves, it cannot be that the State intended to unqualifiedly resurrect the perpetuity, with its inherent social evil, that prior experience had utterly condemned. Even though the proviso, saving the former authority of the courts, in this lately reopened field, is not so worded as to expressly make reasonableness in amount a condition precedent to legality of these new burial trusts, still reasonableness in amount is mentioned prominently enough

in these acts to indicate the policy of the State and the spirit of this trust legislation to have been that this renewed privilege should not be so misused as to emphasize again, in this our day and age, the unsocial features of a perpetuity which led to its legal destruction in the past. The intention of the Legislature in this proviso seems to have been to remove the ban on this one sort of perpetuity, but not to remove it so absolutely as to prevent the courts from drawing the line between the reasonable and the unsocial use of this perpetual trust, in the manner exemplified in the rulings of the courts of Pennsylvania, under an act similar to ours, but without any " reasonable amount " clause.

Under that Pennsylvania act, it was held (*Matter of Close*, 260 Penn. St. 269) that even where the testator devotes his entire estate to such purposes, the law will not interfere, unless the donation is so gross and extravagant in amount and value as to transgress the rule of public policy.

It was also held by the same court (*Matter of Palethorp*, 249 Penn. St. 389, 399), under the same act, that a testamentary devise of $150,000 in trust, to maintain a family burial lot and to support a proper person to attend to the care of the lot and " show people where it is," was void, as constituting a perpetuity, not for a charitable use, except in so far as the reasonable care of the cemetery lot and structures thereon is concerned; and that any excess must fall into residue and be distributed accordingly. In that case the cemetery lot was about twenty by thirty feet in size. Fifteen thousand dollars had been expended in erections thereon; and there was already in existence a trust fund of $1,000 to provide for its care. The superintendent testified that the company in 1911 estimated that the income derived from the $1,000 would be sufficient to keep this lot in order, but would not provide for replacing memorials. The court sustained the devise in so far as its purpose lay within the scope of their statute, saying: " When Cæsar is forgotten, Gifford's grave must be remembered. In the year of Our Lord, 10,000 a trustee, under the supervision of the Orphans' Court, must see that his grave is properly turfed and free from woods; " but the court balked at anything in excess of that expense, and particularly at what it calls " this testator's direction for a perpetual barker " who was " to show people where " the testator's remains were buried.

In this lengthy discussion of the unusual case presented by Mrs. Turk's last will, there are three points: *First,* the incapacity of the commission to assume or execute a trust for a private purpose necessitates the appointment of a substitute trustee by the

52

Supreme Court; and *second*, that the trust, in the hands of any trustee, violating, as it does, the spirit of the enabling acts, must be strictly construed, and having been found unreasonable in the circumstances of this estate, declared unenforcible in so far as it overruns a reasonable proportion of the assets. Lastly, and aside from those two points, there is also the question whether the facts show a definite, actual intention, clearly expressed, that any such amount as $9,000, the whole net estate, should go for care, and for nothing but care of these humble graves, until the crack of doom.

Grammatically and literally, the mere words, on the face of this will, are clear in their general, indefinite direction that " all " should go for " care " forever. When, however, we apply the will to the things to which it related as its date, and consider the mind behind the words, the lowly station in life of the testatrix, her not unfriendly attitude towards the relatives, the property she then had, her lack of income, conditions at the cemetery as of the date of the will, and what estate she meant to have applied thereto under the broad word " care," it is equally clear that to carry out, literally, the provisions of the will, would, in the language of *Emans* v. *Hickman* (*supra*) result in " absolute folly; " and this reflects doubt on the existence of a clear, definite intention in her mind, corresponding to any such interpretation of the words of the will.

Upon looking into the detail of those things which are indicated in the will by the general and indefinite terms, " all " and " care; " and upon applying those terms to the facts, in the light of all the circumstances contemporaneous with the act of subscribing this paper dated February 16, 1926, as compared with the effective date of death, I find as a fact, in this third aspect of the case, that there was not in the mind of this testatrix a definite, clear intention, corresponding to the literal interpretation now sought to be impressed upon this will, or any intention that any such amount as $9,000 should go for perpetual care, to the exclusion of any other application of that estate to any purpose whatever, save debts, funeral and administration expenses; and I conclude, upon the whole, that there is a partial intestacy as to such part of this estate as may remain after payment of the expenses last mentioned, after a reasonable amount shall have been set apart for perpetual care of the burial lot, which the contestants, upon the argument, said might be set apart in disposing of this matter.

As a suggestion of what would be reasonable in the premises, this court would accordingly approve the erection of two headstones or monuments on this lot of the same type as those now standing at the children's graves, shown in the photos in evidence; one of

MATTER OF VAN VALKENBURGH. 819

Misc. 819]    Surrogate's Court, New York County, February, 1927.

which should be set up over the grave of this testatrix, and correctly inscribed with her name and other suitable memoranda; and the other over the grave of her husband likewise inscribed; and that the bounds of the lot be marked in such a way as the cemetery regulations may permit; and that the sum of $1,000 be deposited with the city treasurer in the " perpetual contract fund," and the covenant of the city officials taken therefor to perpetually expend annually, through the Mount Hope Cemetery Commission, all the income from such sum on the care of this burial plot and the graves and monuments there located; and that these outlays be at the general expense of this estate.

Let a decree be entered probating this will and construing it in accordance with this decision; and also make provision for allowance to the special guardian, to be fixed on presentation of the decree; and also for costs to the contestants, to be taxed.